**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
(EASTERN DIVISION)**

UNITED STATES EX REL.,

     PATTI HOWARD,

         Relator,

BRINGING THIS ACTION ON BEHALF OF THE
UNITED STATES OF AMERICA,

c/o PATRICK J. FITZGERALD, ESQ.
UNITED STATES ATTORNEY, N.D. ILLINOIS

     and

ERIC H. HOLDER, JR.
ATTORNEY GENERAL OF THE UNITED
STATES,

        Plaintiffs,

     v.

ALTA COLLEGES, INC., WESTWOOD
COLLEGE, INC., ELBERT, INC. d/b/a
WESTWOOD COLLEGE

        Defendants.

1:11-cv-02696
Judge James F. Holderman
Magistrate Judge Maria Valdez

Captioned as:

United States ex rel. Howard v.
Alta Colleges, Inc.

**VERIFIED COMPLAINT FOR
DAMAGES AND OTHER RELIEF
UNDER THE FALSE CLAIMS ACT**
Filed Under Seal pursuant to
31 U.S.C. §3730(b)(2)



**FILED**

APR 2 2 2011

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## I.    **INTRODUCTION**

1.    This is an action brought by Qui Tam Relator Patti Howard, an employee of the

Defendant Elbert, Inc. d/b/a Westwood College (hereinafter, "Westwood College"), which is a

wholly-owned subsidiary of Westwood College, Inc., which, in turn, is a wholly-owned

subsidiary of Alta Colleges, Inc. (hereinafter, "Alta") (collectively, the "Defendants"), pursuant

to the False Claims Act, 31 U.S.C. §§ 3729, as amended, in the name of the United States Government (hereinafter, the "United States"), for false claims submitted to or caused to be submitted to the United States by Defendants.

2.     Defendants submitted, or caused to be submitted, to the United States applications for Federal Student Aid (FSA), while knowingly or intentionally concealing their non-compliance with federal law, state regulations and the protocols of accreditation. The inaccurate information Defendants submitted, or caused to be submitted, was used to fraudulently attract students and to obtain FSA funds from the United States that they would not have otherwise been entitled to.

3.     In brief, Defendants operate a private, for-profit, institution that earns income by providing educational services to the students it attracts. The majority of the students that attend Westwood College receive financial aid, through the FSA Programs, to help them pay their tuition.

4.     In order to receive FSA monies from their students, Defendants must certify to the United States Department of Education ("DOE") that they are accredited and comply with the Federal Provisions relating to student assistance programs as codified in the United States Code Title 20, Chapter 28, Subchapter IV.  Defendants must also comply with the laws of the states in which they operate.

5.     As alleged herein, Defendants do not comply with these requirements.

6.     Specifically, Defendants:  (a) do not satisfy the requirements of accreditation of the Accrediting Council for Independent Colleges and Schools ("ACICS"); (b) are in violation of the Clery Act, 20 U.S.C. § 1092(f); (c) are in violation of the Illinois Campus Security

2

Enhancement Act of 2008; and (d) violate the rules for student recruitment within all of the states in which they recruit.

7.       Additionally, Defendants have engaged in various schemes to submit fraudulent financial aid claims to the United States.

8.       The False Claims Act, as amended, 31 U.S.C. § 3729(a)(1)-(3), (7), provides that any person who, with actual knowledge, or in reckless disregard or deliberate ignorance of the truth, presents, or causes to be presented, a false or fraudulent claim to the United States Government for payment or approval; or who makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or who conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; or who knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, is liable to the Government for a civil penalty of not less than $5,000 and not more than $10,000 for each claim (with upward adjustments for inflation as provided by statute), plus three times the amount of damages sustained by the Government because of the false claim.

9.       Defendants knowingly failed to comply with the requirements of the FSA Program. Moreover, by submitting, and causing to be submitted, to the United States fraudulent claims for payment, the Defendants are liable to the United States under the False Claims Act.

## II.      JURISDICTION AND VENUE

10.       This action arises under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, 41 U.S.C. §§ 46-48c, and other applicable laws.

11.       Jurisdiction in this action is conferred on this Court by 31 U.S.C § 3729(a) and 28 U.S.C. §§ 1331 and 1345, in that this action arises under the laws of the United States on behalf of the United States.

12.     Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a), because one or more of Defendants either resides or maintains executive offices in this Judicial District, and a substantial portion the acts and transactions constituting the violations of law alleged in this Complaint occurred, in substantial part, in this Judicial District.  Moreover, Defendants have received substantial compensation in this Judicial District by doing business here and engaging in numerous activities that had an effect in this Judicial District.

13.     Relator is knowledgeable as to Defendants' false representations about Defendants' qualifications to participate in the FSA Program and their violations of federal and state laws.  Relator has direct and independent knowledge of the information on which these allegations are based and is an original source as defined in 31 U.S.C. §3730(e)(4)(B).  Relator voluntarily provided this information to the Government prior to filing suit, including by voluntarily providing extensive and detailed information to the Department of Justice.

## III.    PARTIES

### Plaintiffs

14.     The Plaintiffs in a *qui tam* action are the United States and the Relator who brings the action on behalf of the United States.

15.     Relator Patti Howard is an individual citizen of the United States and the State of Illinois.  Relator brings this civil action for violations of 31 U.S.C. § 3729(a) for herself and for the United States Government pursuant to 31 U.S.C. §3730(b)(1).

### Defendants

16.     Alta Colleges Inc. ("Alta") is a Delaware corporation, headquartered at 2000 South Colorado Boulevard, Denver, Colorado  80222.

17.     Westwood College, Inc., a Colorado Corporation and wholly owned subsidiary of Alta, is the operating company for seventeen colleges and trade schools offered in six states and operating under the names Westwood College and Redstone College.

18.     Elbert Inc. is a Colorado corporation that operates Westwood College campuses in Woodridge, Illinois; Fort Worth, Texas; and Atlanta, Georgia.

19.     Elbert, Inc. is a wholly-owned subsidiary of Westwood College, Inc.

20.     Elbert Inc. d/b/a Westwood College – DuPage recruits students and maintains a campus at 7155 Janes Avenue, Woodridge, Illinois 60517.

21.     Elbert Inc. may be served through its agent, CT Corporation System, 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

22.     Alta, Westwood College, Inc. and Elbert, Inc. are collectively referred to as "Defendants," unless otherwise noted.

## IV.     FACTUAL ALLEGATIONS

23.     Defendant Alta is a private for-profit institution. Alta, through its subsidiaries, owns and operates seventeen college campuses located in Illinois, Colorado, California, Georgia, Texas, and Virginia that award diplomas, associate degrees and bachelor degrees.

### A.     Federal Regulations and Participation in the Federal Student Aid Program

24.     Defendants participate in the Federal Student Aid ("FSA") Program of the United States Government as a proprietary institution of higher education.

25.     To participate in the FSA Program, Defendants entered into a written program participation agreement ("PPA") with the Secretary of the United States Department of Education ("DOE"). The PPA conditions the initial and continued participation of an eligible institution in any Title IV, HEA program upon compliance with the provisions of this part, the individual program regulations, and any additional conditions specified in the program

participation agreement that the Secretary requires the institution to meet. United States Code Title 20, Ch. 28 § 1094, lays out numerous criteria that the institution must comply with in order to participate in the Title IV program. These criteria include providing students with truthful job statistics, relevant State licensing requirements of the State in which such institution is located for any job the course of instruction is designed to prepare such prospective students. 20 U.S.C. § 1094(a)(8).

26. As an institution of higher education, as that term in defined by 20 U.S.C. § 1001, Defendants are also required to provide training for gainful employment in a recognized occupation and include certain requirements for instructional time.

27. Finally, Defendants certified to the DOE that its programs are approved by the relevant state agencies before it was entitled to receive any Title IV funding from the DOE.

28. In order to award FSA Program funds to students, Defendants are required to certify that they are an eligible institution, that their educational programs are eligible, make certain that the program is included under the notice of accreditation from a nationally recognized accrediting agency, and make certain that it is authorized by the appropriate state agency to offer the program. (34 C.F.R. Section 668.8).

**B. Defendants Failed to Comply with the Standards for Maintaining Federal Student Aid**

29. As detailed above, Defendants are required to comply with the PPA requirements in order to participate in the FSA Program.

30. Defendants do not meet the standards for continued participation in the FSA because they have failed to comply with, among other things: (a) the accreditation requirements; (b) the Clery Act; and (c) the Federal, Illinois, and other state PPAs.

### 1.   **Defendants' Fail to Comply With Accreditation Standards**

31.    Defendants' sole accreditation comes from the Accrediting Council for Independent Colleges and Schools (ACICS).    ACICS is the largest national accrediting organization of degree-granting institutions.    ACICS accredits professional, technical and occupational programs, and is one of two national accreditors recognized by both the U.S. Department of Education and the Council for Higher Education Accreditation

32.    According to the ACICS' *Accreditation Criteria Policies, Procedures and Standards*, "colleges and schools accredited by it are required to meet and maintain high standards of faculty qualifications, student retention and student placement." ACICS' website lists the minimum criteria necessary for an institute to be accredited:

> To be eligible for consideration for accreditation, an institution or entity must satisfy the following minimum requirements.
>
> (a) It shall be either an institution of postsecondary education (as herein defined) primarily offering certificates or diplomas and postsecondary institutions offering associate's, bachelor's, or master's degrees in programs designed to educate students for professional, technical, or occupational careers; or a noninstitutional entity offering professional enhancement education.
>
> An institution is presumed to be an institution of postsecondary education if it (1) enrolls a majority of its students in one or more programs, the content of which is on a postsecondary academic level and which leads to a postsecondary academic credential (such as a certificate, diploma, or degree) or an occupational objective; (2) enrolls students who possess a high school diploma or its equivalent, or who are beyond the age of compulsory school attendance and demonstrate through valid assessment an ability to benefit from the educational experience; and (3) offers at least one program which is a minimum of 300 clock hours in length.
>
> A noninstitutional entity must enroll a majority of its students in one or more programs, the content of which is on the postsecondary level or at a level which prepares the student for immediate enrollment into a postsecondary program. A noninstitutional entity is ineligible to participate in federal student aid programs or to award degrees.
>
> (b) It shall be legally organized; licensed by (1) the appropriate state education agency for postsecondary institutions or (2) the appropriate state agency for authorizing the conduct of business in that state for noninstitutional entities; and

have offered its educational services to the general public for at least two years immediately prior to consideration of the application by ACICS.

(c) Its mission shall be to offer educational programs which help students develop skills and competencies to enhance their careers.

(d) Its residential enrollment and enrollment in each program shall be sufficient both to support course work and learning experiences that, separately or in combination, constitute measurable and defined educational programs, and to enable ACICS to assess the educational effectiveness of those programs.

(e) It shall have a sufficient number of graduates from a majority of its programs to enable ACICS to assess the educational effectiveness of those programs. Programs offered at any credential level from which there are no graduates will be reviewed in accordance with Section 2-2-502.

(f) It shall be in compliance with all applicable laws and regulations.

(g) It shall be organized as a corporation, as a limited partnership with a corporate general partner, or as a limited liability company.

(h) Its evaluation for accreditation shall be authorized by the chief executive officer.

(i) Its owners or managers shall not have been debarred by ACICS (*See* Section 2-3-1000).

33.     In order to ensure that these standards are being met, the ACICS imposes on its

applicants strict record keeping duties.  Specifically, ACICS emphasizes that:

Careful recordkeeping is crucial to the smooth day-to-day operation of an institution. The data from these records are important to the institution for future planning, to students for informational purposes, and to evaluation teams during school visits. All such records should be maintained at each institutional site or shall be available at each site during evaluation visits. The Council expects at least the following:

(a) Adequate records shall be kept by each institution relative to administrative operations. These include financial aid activities, admissions, curriculum, accreditation and licensure, guidance, instructional resources, supplies and equipment, school plant, faculty and staff, student activities, and student personnel.

(b) For all students admitted under an ability-to-benefit determination, the institution shall maintain records of the validated test scores, initial and periodic academic and career advising, and any other factors used by the institution to support its admissions determination.

8

(c) For institutions admitting students under an ability-to-benefit determination, documentation shall be maintained to evidence the relationship between test cut-off scores on whatever test the institution uses and successful academic or employment outcomes.

Such records could include such data as admissions rate (acceptances versus rejections), completion rate of those enrolled, general placement rate, or specific career placement rate.

For students tested and enrolled based on a test's validity to predict aptitude, the test score should predict successful completion of the program. Institutions must develop longitudinal data comparing the test cut-off score(s) utilized for acceptance with the eventual success of students.

An institution admitting a high percentage of applicants based on testing and losing a comparably high percentage of those students before completion (even allowing for factors other than ability) may not be using the appropriate test to measure aptitude, or the cut-off score for admission is too low, or both. The use of the minimum cut-off scores determined by the U.S. Department of Education will not, in and of itself, satisfy the requirements of this section.

(d) For high school graduates or those with high school equivalency, the institution shall have on file evidence that the student has received a high school diploma or its equivalent. A signed statement by the student is acceptable documentation. The student's record also may include personal background information, evidence of other educational experiences (including certificates, diplomas, or degrees earned), or information about the ability of the student to benefit from the education offered, including any aptitude testing information or recommendations from other sources.

(e) A permanent academic record (transcript) of the student's progress shall be maintained. Compatible with the institution's mission, the transcript shall indicate student accomplishment in terms of clock hours, units of credit, or some other recognized system. The grading system used shall be fully explained on the transcript and must be consistent with that appearing in the institutional catalog.

(f) All basic records and reports pertaining to students shall be safely protected. Acceptable methods of protecting records from theft, fire, water damage, or other possible loss include appropriately fire-rated file cabinets (that can be and are locked when not being used); a central location such as a vault, the entirety of which is protected; and microfilmed records, computer disk, backup tape, printout records, or other hard copies of records protectively stored off the premises.

(g) Certain basic records shall be maintained by the institution for a specified period of time. Transcripts should be kept indefinitely, and admissions data and other records should be kept for at least five years from the last day of attendance.

Financial aid records shall be maintained according to the guidelines established by the funding source.

34.     Additionally, ACICS requires each of the schools it accredits to submit an annual report detailing the number of students graduated, the percentage of students gainfully employed in their field of study, and the salary that each student makes as a result of that employment.

35.     In particular, before renewing an institution's accreditation, ACICS requires that institution to certify that "the institution . . .  conducts course/program evaluations, including assessment of student learning outcomes, student retention and placement, and student, graduate, faculty, and employer satisfaction." *Accreditation Criteria Policies, Procedures and Standards*, at Appendix H.

36.     Defendants cannot meet ACICS's accreditation standards.   In particular, Defendants do not submit accurate documentation regarding student retention, job placement, or employer satisfaction.   Because Defendants' students are often unemployable once they graduate, Defendants regularly submit annual reports to ACICS that provide false employment and salary information for their graduating students.

37.     In the 2009 Annual Report submitted by Westwood College to ACICS, Defendants list numerous instances of its graduates purportedly shown to be fully employed and hundred thousand dollar salaries when, in fact, that information is inaccurate.

38.     The document lists students, employers, and salaries.  Upon inspection, however, it becomes blatantly apparent that much of the information is false.  In order to augment Westwood College's statistics, many students are listed as working for Westwood employees and or their relatives, when in fact that is not the case.  For example:

10

(a)     Nate Wessler is listed as being employed by Sheila Byers. Ms. Byers is the head of a department at Westwood College and does not independently employ students or recent graduates.

(b)     Moises Bahena is listed as employed by Richard Byers. Richard Byers is Sheila Byers' husband, and not an independent employer.

(c)     Ryan Kandolph is listed as being employed by Kelly Moore. Kelly Moore is the Campus President and does not independently employ students or recent graduates..

39.     Moreover, while some of Defendants' graduates may have been assigned and paid for one minor project, that project and payment has been projected over the course of one year and that projection has been used to indicate what that student "could" make over that year.

40.     For example, Nate Wessler and Moises Bahena are both purported to have an annual salary of $104,000. This is completely false. The reality is that each of these recent graduates made one flyer for the school and made around $100 for the flyer. Defendants then estimated an annual salary of $104,000 based on how long it took to make the flyer and how much they were paid for doing it. The truth is that far from making six figure salaries both individuals continued to be unemployed.

41.     Recently, Sheila Byers, the Director of Career Services at Westwood College's DuPage Campus, admitted in a meeting that the previously published figure of 91% of graduates working in their field was inaccurate. The real figure, she noted, was actually 45%.

42.     In short, Defendants lied to the ACICS in order to maintain their accreditation and their eligibility to participate in the FSA Program.

## 2. **Defendants' Failure to Comply With the Clery Act**

43.     The Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act"), is a federal statute, codified at 20 U.S.C. § 1092(f), with implementing regulations in the U.S. Code of Federal Regulations at 34 C.F.R. 668.46.

44.     The Clery Act requires all colleges and universities that participate in federal financial aid programs to retain and disclose information about crime on and near their respective campuses. Specifically, 20 U.S.C. § 1092(f) states, in pertinent part, as follows:

(1) Each eligible institution participating in any program under this subchapter . . . shall on August 1, 1991, begin to collect the following information with respect to campus crime statistics and campus security policies of that institution, and beginning September 1, 1992, and each year thereafter, prepare, publish, and distribute, through appropriate publications or mailings, to all current students and employees, and to any applicant for enrollment or employment upon request, an annual security report containing at least the following information with respect to the campus security policies and campus crime statistics of that institution:

(F)     Statistics concerning the occurrence on campus, in or on noncampus buildings or property, and on public property during the most recent calendar year, and during the 2 preceding calendar years for which data are available—

     (i)   of the following criminal offenses reported to campus security authorities or local police agencies:

|       |                                              |
|-------|----------------------------------------------|
| (I)   | murder;                                      |
| (II)  | sex offenses, forcible or nonforcible;       |
| (III) | robbery;                                     |
| (IV)  | aggravated assault;                          |
| (V)   | burglary;                                    |
| (VI)  | motor vehicle theft;                         |
| (VII) | manslaughter;                                |
| (VIII)| arson; and                                   |
| (IX)  | arrests or persons referred for campus disciplinary action for liquor law violations, drug-related violations, and weapons possession; and |

     ii) of the crimes described in subclauses (I) through (VIII) of clause (i), of larceny-theft, simple assault, intimidation, and destruction, damage, or vandalism of property, and of other crimes involving bodily injury to any person, in which the victim is intentionally selected because of the actual or perceived race, gender, religion, sexual orientation, ethnicity, or disability of the victim that are reported

12

to campus security authorities or local police agencies, which data shall be collected and reported according to category of prejudice.

45.     Compliance with the Clery Act is monitored by the United States Department of Education, which can impose civil penalties – of up to $25,000 per violation – against institutions for each infraction.

46.     Defendants have a history of failing to adequately disclose crime statistics on or near the Westwood College – DuPage campus as the Clery Act requires.

47.     Specifically, as detailed in Relator's disclosure, Defendants fail to maintain the records necessary to track the crime statistics in or around its campus. Moreover, Defendants regularly discourage students from reporting incidents when they do happen.

48.     Most disturbing of all is that Defendants do not have an adequate violence intervention program or any policy for addressing violence on campus. In addition to being mandated by the Clery Act, failure to implement such policies places students and faculty at risk, especially given that Westwood College actively recruits ex-convicts.

49.     As a result of Defendants conduct, they are in violation of the Clery Act and thus subject to fines and suspension from the FSA Programs.

50.     Nevertheless, Defendants continue to submit fraudulent financial aid reports that claim compliance with the Clery Act, even though that is not the case.

### 3.     Defendants' Failure to Comply With the Illinois Campus Security Enhancement Act of 2008

51.     On February 14, 2008, a graduate student at Northern Illinois University entered one of the large lecture halls of the campus and began shooting at the students in the room. By the end of the day there were 24 shot – 6 dead and 18 wounded.

52.     The shooting at Northern Illinois University occurred less than one year after the infamous Virginia Tech Massacre. In that incident, a student, that had been previously

diagnosed with severe anxiety disorder, killed 32 individuals and wounded many others on the campus of the Virginia Polytechnic Institute and State University.

53.    As a reaction to these two incidents, and the obvious lack of safety precautions that could have been taken to prevent them, Illinois created Campus Security Enhancement Act, 110 ILCS 12/, (the "Act") in order to prevent similar incidents from occurring in the future.

54.    The Act requires, among other things, that each institution of higher education to conduct a background check on every individual that it hires, 110 ILCS 12/5, and the creation of a community task force to prevent sexual assaults, 110 ILCS 12/10. Additionally, pursuant to 110 ILCS 12/20(b), each institution of higher education is required to:

> (1) develop a National Incident Management System-compliant, all-hazards, emergency response plan in partnership with the institution's county or major municipal emergency management official, report the plan to this official, and have training and exercises for the plan annually at a minimum; and

> (2) develop an inter-disciplinary and multi-jurisdictional campus violence prevention plan, including coordination of and communication among all available campus and local mental health and first response resources as well as communication with governmental agencies and school districts contiguous to the higher education institution's boundaries, in partnership with the institution's county or major municipal emergency management official, report the plan to this official, and have training and exercises for the plan annually at a minimum. The campus violence prevention plan shall include the development and implementation of a campus violence prevention committee and campus threat assessment team.

55.    Defendants failed to comply with these requirements. Specifically, background checks were not regularly conducted when hiring faculty. In fact, in one notorious incident, an adjunct professor was hired to teach a class by a Program Director even though the professor never submitted any new-hire paperwork and never had a background check. In order to try to avoid detection, the Program Director did not put him on payroll. The professor was eventually let go after it was determined that his credentials were determined to be inaccurate.

56.     Similarly, in order to feign compliance with the Act, Defendants created the VIPER (Violence Intervention, Prevention and Emergency Response) program.  Sadly, the program's efforts are stymied by the Defendants, who, fearing that the real crime statistics of the campuses may be known, prevent the program from adequately gathering statistics or implementing prevention programs.

57.     During the time that Relator was head of the VIPER program her actions were criticized and her responsibilities were reduced so that the program was made to exist in name only.

58.     Defendants' are in violation of Illinois Law.  As a result Defendants are in direct violation of their agreement with the State of Illinois and the DOE.

### 4.     Defendants Fail to Comply with the Program Participation Agreement

59.     As detailed above, in order to participate in the FSA Program, Defendants are required to enter into a PPA with the DOE and with every state in which it recruits students.  The DOE imposes on the college a continuing obligation to maintain accreditation, provide employment and salary figures for graduates, and maintain compliance with the law, including the Clery Act.

60.     Defendants have falsely maintained their accreditation, have provided false employment and salary figures, and have failed to maintain compliance with the Clery Act.  All of these are violations of the PPA, which specifically states, under 20 U.S.C. § 1094(c)(3)(B) that:

> Upon determination, after reasonable notice and opportunity for a hearing, that an eligible institution has engaged in substantial misrepresentation of the nature of its educational program, its financial charges, or the employability of its graduates, the Secretary may suspend or terminate the eligibility status for any or all programs under this subchapter

And

may impose a civil penalty upon such institution of not to exceed $25,000 for each violation or misrepresentation

61.    In addition, Defendants' fraudulent misrepresentations have caused it to remain in the FSA Program and have allowed it to fraudulently receive millions of dollars in federal financial aid.

**C.    Defendants Submitted False Reports to Collect Federal Student Aid**

62.    Upon qualifying to participate in the FSA Program, educational institutions are eligible to attract students that qualify for federal assistance. It is the students who apply for financial aid and use that money to pay the Defendants for their services.

**1.    Defendants Falsify Student Records to Claim Federal Student Aid**

63.    Even though it is the students who apply for financial aid, Defendants are required to maintain accurate records of student attendance and report back to the United States in order to ensure that the aid goes to the students that are actually benefiting from it. If a student only attends the first few days of a class the school must return to the United States tuition for the portion of the semester that the student did attend.

64.    Defendants regularly falsify records about student attendance in order to claim full tuition. Defendants represent that their students have full attendance, even if they only showed up for the first few days of class. This misrepresentation enables Defendants to claim full tuition, retain the financial aid it receives from those students, and evade its obligation to return the student's financial aid money to the United States.

65.    In one particular incident of this nature, a student was marked present for classes even though he spent the term in jail.

66.     In another incident, a student enrolled in the Medical Assistance program missed the first five weeks of a ten week class.  Even thought the student could not hope to pass the class, the Registrar's office was told to put her back in the class and rebuild her attendance history, because they needed "the numbers".

67.     In a third incident of this general type, a student went to Relator to complain that she had been placed in a class that she had already taken.  After reviewing her file, the Relator determined that the student had taken the class in August 2009, but never received attendance or a final grade for the class although her attendance history was perfect and she can produce her completed assignments.  The failure to give her credit for the class the first time allowed the Defendants to bill her twice for the same class.

### 2.     Forging a Parent's Signature to Get Federal Student Aid

68.     Since it is only the students who are entitled to receive financial aid, they are the only ones who can apply for it.  Students who are minors must apply for financial aid with consent of their parents or guardian, and must provide their parents' or guardians' financial information.

69.     Relator witnessed Westwood College employees regularly encouraging students to forge their parents' signatures in order to expedite the financial aid process.

70.     Moreover, on at least one occasion, an employee of the Defendants forged a parent's electronic signature in order to submit a student's financial aid application.  Even after being informed of the employee's illegal conduct, Defendants did nothing to inform the United States or to return the money it improperly received for that student.

71.     The practice of submitting, and assisting students in the submission of, forged documents was illegal and the ensuing applications, by virtue of having the wrong signatures on them, were blatantly false and perpetrated a fraud on the United States Government.

**D.** **Attracting Students Under False Pretenses**

72.     Since students are the key to receiving FSA dollars, Defendants have devised any number of schemes to attract them (and their FSA monies), including: (a) advertising educational programs that do not exist; (b) misrepresenting the accreditation of certain of its programs; and (c) placing students in the wrong classes, so that they are forced to take more classes than necessary to obtain their degrees, thereby requiring them to spend more time in school – and enabling Defendants to obtain those students' additional federal financial dollars as a result.

**1.** **Advertising Programs that Do Not Exist**

73.     As detailed in the Relator's disclosure, in order to attract students to its campuses, Defendants advertise programs that may not exist on those campuses. One example of that is the Medical Assistance Program.

74.     At Westwood-DuPage Campus, the Medical Assistance program is a non-accredited diploma program. While a similar accredited Associates degree program is offered at the Colorado Campus, that program is not available at the DuPage Campus. Nevertheless, Defendants advertise the program as if existing at DuPage.

75.     As a result of this false advertising many students are drawn to the school and sign up for classes. By the time those students learn that their "Medical Assistant" diplomas will essentially be worthless, due to the non-accredited status of that program, Defendants will have already obtained thousands of dollars of federal financial aid money for those students.

**2.** **Misrepresenting the Value or Accreditation of Programs**

76.     Defendants also regularly lie about the value of the degrees that students are expected to obtain from their institution(s). Correspondingly, Defendants claim their programs have certain accreditations, which they do not have.

77.     For example, for many years Defendants represented to their students that the criminal justice degrees obtained by the students would allow them to seek employment with the Chicago Police Department. This was inaccurate; time and again the Chicago Police Department rejected Defendants' graduates because Westwood College's Criminal Justice Program failed to meet the Police Department's standards.

78.     Defendants knew this information was false and inaccurate at the time that they were disseminating it. Nevertheless, they continued to do so. Indeed, it was not until November 2010, when the school acknowledged that the information previously provided was inaccurate. In an announcement to the student body, made on November 19, 2010, Defendants stated, in pertinent part, as follows:

> **In a major change for the Chicago Police Department, they will now accept applications from Westwood students and graduates**. Applicants meeting the age, education and residency requirements are eligible to take the police officer exam. During November, recruiters will visit all four Chicago campuses. (Emphasis added).

79.     Sadly, while the announcement purports to provide good news for the students currently in the program, the many students that entered the program in past paid for and received worthless degrees.

### 3.     Placing Students in the Wrong Classes

80.     Defendants require incoming students to take an entrance exam upon being admitted to Westwood. The admission exam purportedly measures the students' academic capabilities.

81.     Irrespective of students' qualifications, however, students who often require remedial classes are placed in regular level courses.

82.     As a result of this practice, students often fail out of the regular level courses and then are forced to take remedial classes before being placed in regular courses again. In short,

the practice leads to such students needing to take extra semesters of classes at Westwood College. For Defendants, it means that they get an extra semester of those students' FSA dollars.

**E.     Relator's Employment with Defendants**

83.     Patti Howard has been an employee of Westwood College, for almost four years and has firsthand knowledge of all of the allegations in this complaint.

84.     Ms. Howard started working with Defendants, in January 2007 as an adjunct professor for the School of Justice. Ms. Howard worked her way through Defendants' ranks and currently serves as the Education Assistant to the Academic Dean and Registrar. Until recently, Ms. Howard also maintained her teaching status.

85.     In addition, Ms. Howard was the acting Campus Coordinator for the violence intervention, prevention, and emergency response team, having administered the student response team as well.

86.     Ms. Howard has consistently received glowing performance evaluations. Last year she received an "Employee of the Term" award, as well as an award entitled "Committee Person of the Year."

87.     During her employment at Westwood College, Ms. Howard has come to learn of the Defendants' many violations and, on more than one occasion, has raised these issues with her superiors.

88.     None of Ms. Howard's complaints have been acted upon. Instead, as a result of speaking up, she has been retaliated against.

89.     Specifically, while head of campus security, Relator was put in charge of implementing the VIPER program. The Program was created in order to comply with the Clery Act and with the Illinois Enhanced Campus Security Act. Nevertheless, when the Relator tried to do her job, the Campus President insisted that she turn over her responsibilities to another

department, insulted her (by, among other things calling her "a glorified note taker" to her colleagues), and then, ultimately, pressured her to resign from that position.

90.     These actions made it very clear to the Relator that the Defendants had no intentions of complying with the law and that any attempts to move beyond the status quo would be frowned upon and retaliated against.

## V.     FALSE CLAIMS ACT ALLEGATIONS

91.     Pursuant to Defendants PPA with the DOE, Defendants agreed that they would maintain their accreditation, provide the government with certain accurate information, and comply with all laws, including the Clery Act.

92.     In order to receive payment from the United States Government und the FSA Programs, Defendants intentionally or knowingly made, prepared or caused to be made or prepared, false statements and false claims for payment or approval, based upon the records described above and intentionally or knowingly presented or caused them to be presented to an officer or employee of the United States Government in order to obtain approval and payment from the Government.

93.     Defendants repeatedly, knowingly, and/or intentionally made fraudulent claims while stating that they were in compliance with the PPA.

94.     Defendants were aware of their blatant, serial, and ongoing disregard for PPA's requirements, including, but not limited to, internal audits and investigations, and the Relator's complaints to her superiors.

95.     Defendants intentionally, knowingly, or recklessly failed to make the necessary inquiry to establish that the claims it submitted to the Government were not false or fraudulent under the False Claims Act.

96.    In seeking payment from the Government, Defendants falsely certified that they were in compliance with the PPA when, in fact, they were not. Thus, the requests for payment that Defendants submitted, pursuant to the fraudulently submitted FSA requests, were false claims.

97.    Relator, the general public, and the United States and other public and private entities were harmed by Defendants' actions.

98.    This action is not based upon any prior public disclosures, as that term is defined in the False Claims Act, nor have any prior public disclosures of the allegations or transactions alleged in this action occurred, except those initiated or made by Relator or that occurred as a result of Relator'' disclosures.

## VI.    CLAIMS ALLEGED

**COUNT I**
**VIOLATION OF 31 U.S.C. § 3729(A)(1)**

99.    Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

100.    Defendants knowingly and falsely represented to the United States Government that it was in full conformance with the terms of its PPA, in order to obtain Federal Student Aid payments, in violation of the 31 U.S.C. § 3729 (a).

101.    Defendants, by and through its officers, agents, employees, and/or subcontractors, knowingly presented or caused to be presented to an officer or employee of the United States false or fraudulent claims for payment or approval.

102.    Specifically, Defendants, by and through its officers, agents, employees, or subcontractors, knowingly presented and/or caused to be presented claims for payment for FSA that Defendants knew, recklessly disregarded, and/ or deliberately ignored, were false.

22

## COUNT II
## VIOLATION OF 31 U.S.C. § 3729(A)(2)

103.     Relator realleges and incorporates by reference each of the allegations in the preceding paragraphs as though fully set forth below.

104.     Defendants knowingly made, used, and/or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the United States Government.

105.     Specifically, Defendants made and/or caused to be made false statements concerning Defendants' accreditation and compliance with federal law, in connection with false claims for payment that Defendants knew, recklessly disregarded, and/or deliberately ignored were false.

## VII.    REQUEST FOR RELIEF

WHEREFORE, Relator, as to Counts I and II, on behalf of herself and the United States Government, pursuant to 31 U.S.C. §3730(c)(5) and (d) respectfully requests:

A.     That this Court enter judgment against Defendants in an amount equal to three times the damages the United States Government has sustained because of Defendants' actions, plus civil penalties of at least $5,000 to $10,000, with penalties adjusted upwardly as specified by applicable law, for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

B.     That in the event that the United States Government continues to proceed with this action, or proceeds with any alternative remedy available to the Government, Relator be awarded an amount for bringing this action of at least 15%, but not more than 25%, of the proceeds of this action and the alternative remedy or settlement of any such claim;

C.     That in the event that the United States Government does not proceed with this action, but pursues an alternate remedy, Relator be awarded an amount the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than 25% nor more than 30% of the proceeds of this action and the alternate remedy or the settlement of any such claim;

D.     That the United States Government and Relator receive all relief, both at law and at equity, to which it and she may reasonably appear entitled;

Dated:  April 22, 2011

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLC

By: _____
Adam J. Levitt
55 West Monroe Street, Suite 1111
Chicago, Illinois  60603
Tel:  (312) 984-0000
Fax:  (312) 984-0001

Martin E. Restituyo
**WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York  10016
Tel:  (212) 545-4600
Fax:  (212) 545-4653

Jeffrey A. Leon
Jamie E. Weiss
**FREED & WEISS LLC**
111 West Washington Street, Suite 1331
Chicago, Illinois 60602
Tel: 312-220-0000

646250

24